## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                Case No. 06-Cr-005

SAMUEL L. THURMAN,
WILLIAM D. NORTH,
JIMMIE L. PERKINS and
CLIFTON J. MOBBS,

    Defendants.

### MAGISTRATE JUDGE'S RECOMMENDATION TO THE HONORABLE RUDOLPH T. RANDA

### NATURE OF THE CASE

    The defendant is charged in a three-count indictment along with co-defendants Samuel L. Thurman, William D. North, and Clifton J. Mobbs. Defendant Perkins is charged with defendant North in Count One with being convicted felons in possession of five firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant Perkins is named only in Count One. Defendant Perkins (hereinafter defendant) filed several pretrial motions, all but one of which have been addressed by the court. The defendant's motion to suppress statements will be addressed herein. (Docket #38).

    The government has filed a motion to admit the defendant's confession as impeachment evidence. (Docket # 48). This motion also will be addressed in this decision and order.

## MOTION TO SUPPRESS STATEMENTS

The defendant has moved to suppress all statements he made to law enforcement officers on the grounds that they were obtained in violation of his constitutional rights. The government concedes that the defendant's statement cannot be used in its case in chief at trial because Milwaukee Police Department (MPD) Detective Donald Ours' procurement of the statement violated the defendant's protection against self-incrimination as set forth in Miranda v. Arizona.[1] The government states that it appears "that Detective Ours did not honor [the defendant's] invocation or wish to "cut off" questioning twice during the interview on April 12, 2005" and that "no new Miranda warnings were given to [the defendant]" prior to his eventual confession. Thus, the government will not be using the defendant's confession in its case in chief. Accordingly, to the extent the defendant's motion relates to the suppression of his statement in the government's case-in-chief at trial, the motion is moot.

However, the government seeks to use the defendant's confession as impeachment evidence if the defendant chooses to testify at trial. The defendant's motion seeks suppression of the confession for all purposes.

On April 11, 2006, the court conducted an evidentiary hearing on the defendant's motion. At the hearing, the parties agreed that the issue before the court was whether the defendant's statement was given voluntarily after he invoked his right to remain silent. The following individuals testified at the hearing: MPD Detective Donald Ours and defendant Jimmie L. Perkins. Based on the evidence presented at the hearing, the court makes the following findings of fact.

---

[1] 384 U.S. 436 (1966).

- 2 -

**Findings of Fact**

On August 9, 2005, Milwaukee Police Detective Brian Reilly asked Detective Donald Ours to interview defendant William North in connection with a reported theft of guns. Previously, Detective Reilly had interviewed defendant Perkins and Detective Reilly informed Detective Ours what the defendant had said. Detective Reilly asked Detective Ours to talk to defendant Perkins again and clear up any discrepancies if defendant North said something contrary to what defendant Perkins had previously stated. At the time, the defendant was in custody. Detective Ours first interviewed the defendant on August 10, 2005, at approximately 2:35 a.m.

Subsequently, MPD Detective Pat Fortune asked Detective Ours to talk to both defendants North and Perkins to obtain further clarification of their respective statements. On August 12, 2005, at 2:05 a.m., Detective Ours went to the Criminal Justice Facility to interview the defendant, who was brought there from the Milwaukee County Jail.

The defendant was awakened over the intercom in his cell at approximately 2:00 a.m. He was advised that he "had a professional visit." The defendant, who was sleeping at the time, did not know who was coming to visit him. The sheriff's deputy buzzed his door and the defendant was able to exit the cell and went into the hallway. He was escorted to the interview room by a sheriff's deputy. The defendant entered the interview room because the deputy sheriff told him to do so. Once he entered the interview room, the door locked behind him.

The interview room was approximately 8'x10' and contained two chairs and a table. The only window in the room was a window in the door to the hallway. During the interview, the defendant was not handcuffed.

The defendant was not too happy to see anyone since it was 2:00 a.m. After the defendant sat down in the interview room, Detective Ours explained to him that he had to go over the defendant's statement and to try to clear up some discrepancies.

Detective Ours took out two "advice of rights" cards, one of which he gave to the defendant. He read the advice of rights on the card to the defendant and then asked him if he understood each of his rights. The defendant responded that he did. Detective Ours then asked him: "Knowing these rights, do you wish to make a statement." The defendant responded, "yes." According to the defendant, he told Detective Ours that he did not want to talk to him.

Detective Ours said that the defendant began to answer questions, but then he became frustrated and began to pace in the room. The defendant stated that he had gone over this information previously and asked why he had to go over it again. The defendant stated that, "he was done," that "he was tired," and that he "didn't want to go over the information again."

The defendant jumped up from his seat in frustration more than twice during the course of the interview. He stated, "I'm done. I'm through." The defendant then went over to the door and pounded on the window, telling the deputy sheriff, "I'm done with him." He also stated to the deputy: "I don't want to talk to him. I want to go back." The deputy sheriff looked in the window of the door to see if everything was okay in the interview room.

According to the defendant, the deputy sheriff asked Detective Ours if he was done interviewing the defendant. When Detective Ours said, "no, the deputy sheriff told the defendant that he could not let him out. According to Detective Ours, when the deputy came to the window in response to the defendant's pounding, Detective Ours made a gesture to the deputy sheriff that they were okay. Detective Ours testified that he said, "Jimmie, have a seat.

- 4 -

Case 2:06-cr-00005-RTR   Filed 04/18/06   Page 4 of 11   Document 51

Calm down, we need to go over this." When he asked the defendant to sit down, the defendant did so. The defendant calmed down after he sat down.

On at least one other occasion, the defendant jumped up and said that he was done with the interview. He banged on the door to attract the attention of the deputy sheriff. The defendant told the deputy sheriff that he was ready to leave. The deputy sheriff told the defendant that he could not leave until Detective Ours said he could leave.

Detective Ours stated that he told the defendant to have a seat because they needed to go over the information. He spoke to the defendant in a calm voice and did not threaten him or make any promises to him. Detective Ours testified that the defendant would calm down during the course of the interview. Although Detective Ours advised the defendant of his Miranda rights at the beginning of the interview, he did not go over the Miranda rights with the defendant again after the defendant had indicated that he wanted to leave the room. According to Detective Ours, he coaxed the defendant several times to sit back down at the table.

Detective Ours testified that thirty minutes before the interview ended, the defendant said he would tell Detective Ours what had occurred. According to Detective Ours, the defendant appeared relieved at that time. Detective Ours wrote out a statement based upon what the defendant told him during the last thirty minutes of the interview. He read the statement to the defendant and then gave the statement to the defendant to read and to sign. The defendant reviewed and signed the statement.

During the interview, the defendant never asked for a lawyer or specifically said that he wanted to remain silent. According to Detective Ours, he would have terminated the interview if the defendant had said he wanted a lawyer or wanted to remain silent, or he had sat mute

- 5 -

and refused to answer any questions. No food or water was offered to the defendant during the interview, nor did the defendant request any food or beverages.

The statement written by Detective Ours includes information about the defendant being advised of his Miranda rights and the substance of his confession. The statement does not contain any information about the occurrences of the first three and a half hours of the four-hour interview of the defendant. The interview, which began at approximately 2:05 a.m. ended at 6:05 a.m. Detective Ours did not include the defendant's earlier statements because he said they were a repetition of what the defendant had said at earlier interviews.

The defendant testified that he told Detective Ours he was tired at least three or four times. At least five times the defendant told Detective Ours that he did not want to talk to him. The defendant also testified that he put his arms in his sleeves and put his head on the table because he was tired. Detective Ours testified that the defendant never told him he was tired during the course of the interview. Detective Ours initially could not recall whether the defendant had put his head on the table during the interview, but he subsequently testified that the defendant had not done so. He also did not tell the defendant he had to confess before he would be allowed to go back to his room.

The defendant said that he gave the statement to Detective Ours because he wanted to go back to his cell. He said he knew he had to answer questions if he wanted to get out of the room.

**ANALYSIS**

In Harris v. New York, 401 U.S. 222, 225-26 (1971), the issue of the use of an illegally obtained statement for impeachment purposes was addressed. The Court held that a statement, which was inadmissible against the defendant in the prosecution's case in chief

- 6 -

because the defendant had not been advised of his rights to counsel and to remain silent prior to making the statement which otherwise satisfied legal standards of trustworthiness, properly could be used for impeachment purposes to attack the credibility of the defendant's testimony at trial. Id. The Court stated:

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks[2] doctrine would be a perversion of the Fourth Amendment.

Id. (quoting Walder v. United States, 347 U.S. 62 [1954], footnote added).

The Court explained that although every criminal defendant is privileged to testify in his own defense, or refuse to do so, "that privilege cannot be construed to include the right to commit perjury." Harris, 401 U.S. at 225. "Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately." Id.; see also, Michigan v. Harvey, 494 U.S. 344, 351 (1990) (statement to police taken in violation of the defendant's Sixth Amendment right to counsel may be used to impeach the defendant's testimony); Oregon v. Hass, 420 U.S. 714 (1975) (statements taken in violation of Miranda, and unusable by the prosecution as part of its own case, were admissible to impeach statements made by the defendant during his direct testimony); United States v. Havens, 446 U.S. 620, 626 (1980); United States v. Madoch, 149 F.3d 596, 601 (7th Cir. 1998). However, *"any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process." Mincey v. Arizona, 437 U.S. 385, 398 (1978); see also, New Jersey v. Portash, 440 U.S. 450, 459 (1979); Madoch, 143 F.3d at 601.

---

[2]Weeks v. United States, 232 U.S. 383 (1914).

In this case, the government acknowledges that it cannot use the defendant's statement in its case in chief, but seeks to use it for impeachment purposes. Thus, the court must determine whether the defendant's statement to Detective Oars was voluntary. To assess the voluntariness of a statement, the court must consider whether, in light of the totality of the circumstances, "the statement was the product of a rational intellect and free will, see Mincey v. Arizona, 437 U.S. 385 (1978), or whether it was obtained by the authorities through coercive means, see Colorado v. Connelly, 479 U.S. 157, 165 (1986)." United States v. Brooks, 125 F.3d 484, 492 (1997). The issue of whether a defendant was coerced into giving a statement is determined from the perspective of a reasonable person in the position of the suspect. Id. (quoting United States v. Fazio, 914 F.2d 950, 955 [7th Cir. 1990]).

In making this determination, the court should consider the defendant's age, education, intelligence level, mental state, the length of the detention, the nature of the interrogation, the use of physical punishment and whether the defendant was advised of his constitutional rights. Brooks, 125 F.3d at 492. Deprivation of food or sleep are also factors to be considered. Id. "However, the test for voluntariness of the statement is whether the claimed impairments caused the defendant's will to be overborne." Id.

In Connelly, 479 U.S. at 165, cited by the defendant, the Court held that coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause. The defendant in Connelly, who suffered from chronic schizophrenia, confessed to a murder. According to the testimony of a psychiatrist who examined the defendant, the defendant was in a psychotic state the day he confessed, which inhibited his ability to make free and rational choices. However, the psychiatrist also testified that the illness did not impair the defendant's cognitive abilities and, therefore, he understood

- 8 -

his rights when the officers advised him that he did not have to speak. According to one of the officers involved, the defendant appeared to fully understood the nature of his acts.

Since there was no evidence of coercive police conduct, the Court held that there was no violation of the due process clause. The Court also concluded that the taking of the defendant's statements, and their admission into evidence, did not violate due process. Thus, there must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by the defendant, on the other." Id.

Here, the defendant asserts that, under the totality of the circumstances, the statement was not freely given. He also suggests that the statement was coerced because he was not allowed to leave the room. The facts indicate that interview of the defendant began at about 2:00 a.m. after the defendant was awakened via intercom and told that he had a visitor. The interview continued for four hours. At the start of the interview, the defendant was advised of his constitutional rights. During the course of the interview, the defendant clearly indicated on at least two occasions that he wanted to terminate the interview, but was not permitted to leave the room. He was not physically or verbally abused. However, the defendant was tired, having been awakened in the middle of the night to be interviewed.

A review of the evidence indicates that the defendant obviously was tired since the interview was conducted at 2:00 a.m. The defendant testified that he told Detective Ours several times that he was tired. The court finds the defendant's testimony credible. However, there is no evidence of physical or psychological intimidation by Detective Ours during the interview when the defendant made the statement. Some sort of government coercion is necessary to find that a confession was not voluntary. Connelly, 479 U.S. at 167.

In this case, the court cannot conclude that the defendant's statement was coerced. The defendant testified that he was tired and frustrated when he gave the statement. However there is no evidence to support the conclusion that his will was overborne when he gave the statement to Detective Ours. The court concludes that the defendant's statement was voluntarily made and was "the product of a rational intellect and free will." United States v. D.F., 115 F.3d 413, 419 (7th Cir. 1997). While the court agrees that the defendant's statements are inadmissible in the government's case in chief, nothing in the record causes this court to conclude that the defendant's statement was involuntary as a constitutional matter, which would render it inadmissible even for impeachment purposes. See Harris, 401 U.S. at 225.

In light of the government's representation that it will not use the defendant's statement in its case in chief, the court will recommend that the defendant's motion to suppress statements be denied as moot. The court also will recommend that the government's motion to use the defendant's statement as impeachment evidence if the defendant testifies at trial be granted.

## **CONCLUSION**

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying as moot** defendant Perkins' motion to suppress statements. (Docket #38).

**IT IS FURTHER RECOMMENDED** that the United States district judge enter an order **granting** the government's motion to admit the defendant's statement as impeachment evidence if the defendant testifies at trial. (Docket #46).

- 10 -

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order.  Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures.  Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 18th day of April, 2006.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge